UNITED STATES of America, Plaintiff-Appellee-Appellant,

v.

CERTAIN PROPERTY Located IN the BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, Consisting of All of Block 726, and Bounded by West 28th and 29th Streets and Ninth and Tenth Avenues, and Irving Givre, et al. (City of New York), Defendant-Appellant-Appellee.

No. 484, Docket 32065.

United States Court of Appeals Second Circuit.

Argued June 4, 1968.

Decided Oct. 21, 1968.

Clyde O. Martz, Asst. Atty. Gen., (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, N. Y., Martin Paul Solomon, Asst. U. S. Atty., New York City, on the brief, Roger P. Marquis, Edmund B. Clark, Attys., Dept. of Justice, of counsel), for plaintiff.

Robert D. Joyce, New York City, N. Y. (J. Lee Rankin, Corp. Counsel for the City of New York, on the brief, George Newman, New York City, of counsel), for defendant.

Before WATERMAN and FEINBERG, Circuit Judges, and ZAMPANO, District Judge.*

ZAMPANO, District Judge:

These are cross-appeals challenging the amount of compensation awarded for the condemnation by the United States of a public bath and recreation center owned by the City of New York. The principal question concerns the proper measure of compensation for the taking of a service facility operated by the City for the public benefit. Specifically, the issue is whether the court below erred in excluding the City's evidence on the necessity and cost of providing a substitute facility for the one condemned.

In 1962 the government instituted condemnation proceedings to acquire an entire block in the Chelsea area of Manhattan for use by the Post Office Department. One of the seven public bath and recreation buildings owned and operated by the City in Manhattan is included in the taking. The building was constructed in 1915 on a 7,530 square foot parcel of land and contains a swimming pool, gymnasium, running track, various exercise and club rooms, and an open playground on the roof. Over 200,000 youngsters and adults use these facilities annually without charge.

On December 31, 1963, the government deposited $313,260.00 in court and took title to the parcel. The next day the property was leased to the City for five years on the condition it be used for the same purposes. Three commissioners, appointed by the United States District Court for the Southern District of New York, Edward J. Dimock, J., awarded the City $552,982.50 for the land, improvements and fixtures. The District Court, over objection, accepted the commissioners' report and entered judgment on April 17, 1967.

At trial the City offered proof of the cost of a new site and building on the theory it was entitled to a substitute facility as just compensation for the taking. The court ruled that the "substitute facilities" doctrine would be applicable only

* Of the District of Connecticut, sitting by designation.

if the City was "legally required" to furnish a replacement for the condemned building. Since the City was authorized by law but not obligated to provide a bath and recreation center (Laws of 1955, Chapter 95 General Municipal Law, McKinney's Consol.Laws, c. 24, § 121), the evidence was rejected. Consequently, compensation was based on the market value of the property.[1] For the reasons set out below, we reverse and remand for further proceedings.

 Under the Fifth Amendment, the owner of property in every condemnation case is entitled to "just compensation." The standard formulation for applying this Constitutional requirement is "indemnity, measured in money, for the owner's loss of the condemned property." Westchester County Park Commission v. United States, 143 F.2d 688, 691 (2 Cir.), cert. denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583 (1944). The owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). In most cases the concept of "market value," i. e., what a willing buyer (one not forced to buy) would pay to a willing seller (one not forced to sell), is applied. The standard of fair market value—particularly with private condemnees—has proven practical and effective. Its variations are adaptable to many common situations: the comparable sales approach when the tract is one in an active commercial market;[2] the capitalization of earnings standard for income-producing property,[3] and the reproduction cost minus depreciation measure of compensation if the building is a rarely traded speciality.[4]

 The principle of fair market value, however, "is not an absolute standard nor an exclusive method of evaluation." United States v. Virginia Electric & Power Co., 365 U.S. 624, 633, 81 S.Ct. 784, 791, 5 L.Ed.2d 838 (1961). It should be abandoned "when the nature of the property or its uses produce a wide discrepancy between the value of the property to the owner and the price at which it could be sold to anyone else." United States v. Certain Land in Borough of Brooklyn, 346 F.2d 690, 694 (2 Cir. 1965). Frequently when public facilities are appropriated, the market value test

---

1. The following is a tabulation of the government's appraisal, the City's estimates, and the commissioner's award:

| | Government | City | Award |
|---|---|---|---|
| Land | $ 58,800.00 | $ 63,000.00 | $ 60,900.00 |
| Improvement | | | |
| Reconstruction cost | 644,655.00 | 899,424.00 | 899,424.00 |
| Depreciation | 386,759.00 | 332,787.00 | 431,723.00 |
| Percentage of depreciation | (60%) | (37%) | (48%) |
| Sound Value | 257,860.00 | 566,637.00 | 467,701.00 |

An additional sum of $24,381.50 was awarded for fixtures, making a total judgment of $552,982.50.

---

2. See, e.g., Hickey v. United States, 208 F.2d 269 (3 Cir. 1953), cert. denied, 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074 (1954); Baetjer v. United States, 143 F.2d 391 (1 Cir.), cert. denied, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618 (1944); see generally 1 Orgel, Valuation Under the Law of Eminent Domain, § 137 (1953).

3. See, e.g., Chicago B. & Q. Ry. Co. v. North Kansas City Development Co., 134 F.2d 142 (8 Cir.), cert. denied, 319 U.S. 771, 63 S.Ct. 1437, 87 L.Ed. 1719 (1943); see generally 1 Orgel, supra §§ 155–175.

4. The reproduction cost minus depreciation concept is generally regarded as one method of computing "market value." See 2 Orgel, supra, §§ 188–199.

is unworkable because these facilities are not commonly bought and sold in the open market, and seldom are operated for profit. Note, Just Compensation and the Public Condemnee, 75 Yale L.J. 1053 (1965). The result has been the development of the "substitute facilities" doctrine to meet the unique needs of public condemnees. Brown v. United States, 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923) (entire town) (dictum); United States v. Certain Land in Borough of Brooklyn, supra (playground); United States v. Board of Education of Mineral County, 253 F.2d 760 (4 Cir. 1958) (school grounds); State of Washington v. United States, 214 F.2d 33 (9 Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954) (highway); Town of Clarksville v. United States, 198 F.2d 238 (4 Cir. 1952), cert. denied, 344 U.S. 927, 73 S.Ct. 495, 97 L.Ed. 714 (1953) (sewer system); City of Fort Worth v. United States, 188 F.2d 217 (5 Cir. 1951) (streets); United States v. State of Arkansas, 164 F.2d 943 (8 Cir. 1947) (highway); United States v. Des Moines County, 148 F.2d 448 (8 Cir.), cert. denied, 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444 (1945) (roads); Mayor and City Council of Baltimore v. United States, 147 F.2d 786 (4 Cir. 1945) (streets and alleys); Jefferson County v. T. V. A., 146 F.2d 564 (6 Cir.), cert. denied, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425 (1945) (highway); United States v. Certain Land in City of Red Bluff, 192 F.Supp. 725 (N.D.Cal.1961) (parking lot). Simply stated, this rule insures that sufficient damages will be awarded to finance a replacement for the condemned facility.[5]

The government argues that the substitution test is an "exception" to the standard market value rule to be applied only when the condemnation involves a public road, sewer, bridge, or similar non-salable service facility. Since the value of the land and building in the instant case was ascertainable by the market value concept, it contends that all damages compensable under the Fifth Amendment were awarded.[6] We disagree.

■ The "substitute facilities" doctrine is not an exception carved out of the market value test; it is an alternative method available in public condemnation proceedings. United States v. City of New York, 168 F.2d 387, 390 (2 Cir. 1948); State of California v. United States, 395 F.2d 261, 266 (9 Cir. 1968). When circumstances warrant, it is another arrow to the trier's bow when confronted by the issue of just compensation.

■ When the public condemnee proves there is a duty to replace a condemned facility, it is entitled to the cost of constructing a functionally equivalent substitute, whether that cost be more or less than the market value of the facility taken. City of Fort Worth v. United States, supra, 188 F.2d at 223; Town of Clarksville v. United States, supra, 198 F.2d at 243. The duty may be legally compelled or one which arises from necessity, United States v. Des Moines County, supra, 148 F.2d at 449; the distinction has little practical significance in public condemnation. Insight into the usefulness and worth of community property may be gained as well from the responsible decisions of public officials and agencies acting under a broad mandate with discretionary powers, as from legislative determinations announced in statutes. Modern government requires that its administrators be vested with the discretion to assess and reassess changing

---

5. United States v. Certain Land in Borough of Brooklyn, supra, 346 F.2d 690; United States v. Certain Lands, 246 F.2d 823 (3 Cir. 1957); City of Fort Worth v. United States, supra, 188 F.2d 217; United States v. Los Angeles County, 163 F.2d 124 (9 Cir. 1947).

6. The government's appeal relates to the commissioner's failure to consider functional obsolescence in valuing the City's building and improvements. In view of our disposition of the City's appeal, this issue need not be decided.

public needs.[7] If application of the "substitute facilities" theory depended on finding a statutory requirement, innumerable nonlegal obligations to service the community would be ignored. Moreover, the "legal necessity" test, applied woodenly, may provide a windfall if the condemned facility, though legally compelled, no longer serves a rational community need. We hold, therefore, that if the structure is reasonably necessary for the public welfare, compensation is measured not in terms of "value" but by the loss to the community occasioned by the condemnation.

This is not to say that every condemned public facility need be replaced. Cross-examination and independent rebuttal evidence are adequate safeguards to test the condemnee's evidence at trial.[8] Substitution may be unreasonable or unnecessary; the public need may no longer exist or adequate alternative facilities may be available.[9] United States v. City of New York, 168 F.2d 387 (2 Cir. 1948). The condemnor's new facilities may serve the same public interest as well or better than the original. Jefferson County v. T. V. A., supra, 146

F.2d at 566; United States v. State of Arkansas, supra, 164 F.2d at 944. Many factors must weigh in the balance.

Even when substitution is required, sumptuous awards need not be feared. Exact duplication is not essential; the substitute need only be functionally equivalent. The equivalence required is one of utility. United States v. Board of Education of Mineral County, supra, 253 F.2d at 764; Town of Clarksville v. United States, supra, 198 F.2d at 242–243. Moreover, equitable principles undergirding just compensation require that the substitution cost be discounted by reason of the benefit which accrues to the condemnee when a new building replaces one with expired useful years. With deference to several contrary holdings,[10] we believe the amount should be calculated and an appropriate deduction made.[11]

Accordingly, we reverse and remand for a new trial to determine whether the "substitute facilities" doctrine should be applied and, if so, the amount needed to acquire and prepare an equivalent site and the cost of a substitute building.

---

7. With the advent of "Home Rule" laws, municipal governments have been vested with increased control over their own property and affairs. In the instant case, the establishment of public baths was not mandatory between 1892 to 1895 (Laws of 1892, Chap. 473); they became mandatory if the Board of Health determined they were necessary in 1895 (Laws of 1895, Chap. 351); and in 1955, the act was again amended, under the City Home Rule Law, to merely authorize cities to operate the baths.

8. After the bath and recreational center was condemned in the instant case, the City promptly instituted studies in 1964–1965 to determine the feasibility of replacing the appropriated facility. The sum of $1,400,000 was committed in the 1966–1967 budget for replacement, and on October 16, 1967, the acquisition of a substitute facility was approved. Title to the substitute site was obtained on December 1, 1967. Although such evidence is weighty, it is not conclusive.

9. Under these circumstances, the condemnee is entitled to a minimum award fixed by market value. United States v.

Certain Land in Borough of Brooklyn, supra, 346 F.2d at 695; State of California v. United States, supra, 395 F.2d at 266.

10. City of Wichita v. Unified School District No. 259, 201 Kan. 110, 439 P.2d 162 (1968); State of Waco Independent School District, 364 S.W.2d 263 (Tex. Civ.App.—Waco, 1963).

11. Several formulas are appropriate. The one that appears suitable under the facts in the present case is the mathematical formula: *one minus the ratio that the remaining useful life of the condemned building bears to the useful life expectancy of the substitute facility.* The City's bath and recreation center was *completed in 1915. The commissioners* accepted a straight line depreciation in their award of 1% per year for the building; thereby implying the building had a useful life of 100 years. When the *condemnation occurred in 1963*, the facility had a remaining useful life of 52 years. However, since the City has had an additional occupancy under the lease, that time must be included in the expired useful life of the building.