**UNITED STATES of America, Appellee,**

v.

**564.54 ACRES OF LAND, MORE OR LESS, situate IN MONROE AND PIKE COUNTIES, COMMONWEALTH OF PENNSYLVANIA, and Benedict F. Pastorini, et al.**

Appeal of SOUTHEASTERN PENNSYLVANIA SYNOD OF the LUTHERAN CHURCH IN AMERICA.

No. 74–1502.

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1974.

Decided Dec. 30, 1974.

---

**15.** S.H. 54 (Sgt. Armstrong); 91–92 (Detective Cupus).

**16.** S.H. 90 (Detective Cupus).

**17.** S.H. 73–75 (Sgt. Armstrong); 90–92 (Detective Cupus).

Wallace H. Johnson, Asst. Atty. Gen., Peter A. Ruvolo, Carl Strass, Lawrence E. Shearer, Attys., Dept. of Justice, Washington, D. C., for appellee.

H. Ober Hess, Peter M. Mattoon, John V. Bonneau, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellant Southeastern Pennsylvania Synod of the Lutheran Church in America.

Joseph C. Kreder, Warren, Henkelman, McMenamin & Kreder, Scranton, Pa., for appellants.

Before HASTIE, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This interlocutory appeal which the district court certified involves a controlling question of law as to which there is a substantial ground for a difference of opinion. The appeal was permitted by this Court pursuant to 28 U.S.C. § 1292(b). The order appealed from arose in an action by the United States for the condemnation of three recreational camps in the proposed Tocks Island recreational area which were owned and operated on a not-for-profit basis by or on behalf of the Southeastern Pennsylvania Synod of the Lutheran Church in America. The land and improvements, according to the owner, have a special character designed specifically for camping purposes.

The order under review was entered during pre-trial proceedings on the government's request for a ruling that the cost of "substitute facilities" is not a proper measure of compensation for the taking of defendant's property, and that evidence at the trial should be restricted to fair market value as of the date of taking, or if that measure is unavailable, to depreciated replacement cost of the properties as improved on that same date. The district court held that the cost of substitute facilities measure of compensation was available only to a governmental condemnee. However, recognizing that if its ruling was in error a fruitless trial might result, the trial court certified the case for an interlocutory appeal on that issue. We reverse.

Appellant Southeastern Pennsylvania Synod of the Lutheran Church in America owned and operated three summer camps located on three separate tracts totaling 305.81 acres along the Delaware River in Monroe County, Pennsylvania. On June 15, 1970 the United States acquired the three camps by filing a notice of taking, and has offered compensation totaling $485,400. The condemnees have offered to prove that the camps have been operated on a nondenominational basis for many years at continuous losses, which losses have been underwritten by the Synod; that there is no ready market for such not-for-profit facilities; that by virtue of grandfather clauses in the Pennsylvania legislation governing recreational camps the Synod could have continued operating the camps with their present somewhat primitive facilities; that because of the same legislation as well as recently enacted federal environmental legislation the development of new camps would require far more elaborate facilities, especially for housing and sewage treatment; and that the cost of development of the new site will total in excess of $5.8 million. At this stage of the case there has been no ruling as to whether all of the items of cost included in appellant's $5.8 million estimate would actually be needed for the development of substitute facilities, but it is undisputed that $485,000 would fall for short of providing for them.

Whether the Lutheran Synod operates camping facilities at a loss because it believes camping builds character, or because it feels a charitable obligation to afford recreational opportunities to persons who would not otherwise be able to afford them, it seems clear that the reason for operating the camps is related to

the Synod's religious mission. Thus the question presented is the extent to which owners of single purpose facilities, operated not-for-profit for a religious or charitable purpose (and having no ready market) are entitled to be indemnified when the federal government condemns the facilities. A closely analogous case would be the condemnation of an ancient church building still in active use for religious purposes.

■ Recently Justice Rehnquist wrote for the Court:

"Our prior decisions have variously defined the 'just compensation' that the Fifth Amendment requires to be made when the Government exercises its power of eminent domain. The owner is entitled to fair market value, United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943), but that term 'is not an absolute standard nor an exclusive method of valuation.' United States v. Virginia Electric & Power Co., 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961). The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, United States v. Commodities Trading Corp., 339 U.S. 121, 124, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950), as it does from technical concepts of property law." United States v. Fuller, 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973).

See also Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 478, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). The basic principle underlying the constitutional requirement of "just compensation" is one of indemnity.[1] The condemnee "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but he is entitled to no more." Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934).

■ If the government condemns property for which there is a ready market (commodities are a classic example) payment of the fair market value is complete indemnity since, whatever its intended use, the condemnee can readily replace it in the marketplace. Some property, however, from its very nature, has no marketplace. An example is a single purpose facility requiring a large capital investment, such as a power generating station. Such facilities usually are operated for profit. When they cannot be valued in the marketplace a fair measure of the government's obligation to indemnify may be the present value of capitalized future earnings. Presumably the investors in a single purpose facility operated for profit will be able to take their capital investment, valued on the basis of the capitalized earning capacity of the facility in which they invested, and put it to another use. Finally, there are facilities which are unique, for which there is no ready market, and which are operated for motives other than profit. With respect to such facilities, neither a fair market value nor a capitalized earnings approach as the measure of the government's constitutional duty to indemnify will produce a fair result.

■ With respect to some unique facilities it may be possible to afford just compensation by calculating depreciated replacement cost to arrive at an approximation of otherwise unavailable proof of market value. For others, however, such a measure will not be fair. Typical of facilities which simply cannot be valued in the marketplace, or by capitalized earnings, or by depreciated replacement cost, are those erected for common public purposes by states or their public subdivisions; roads for example. Fair indemnification in such circumstances requires compensation sufficient to provide a substitution for the unique facilities so that the functions carried out by or on

---

1. Congress, in providing a mechanism for the government's exercise of eminent domain, has adopted the language of the fifth amendment's taking clause. The government's declaration of taking must contain to the owner in fee "[a] statement of the sum of money estimated by said acquiring authority to be *just compensation* for the land taken." 40 U.S.C. § 258a (emphasis supplied).

behalf of members of the community may be continued. Depreciated replacement cost often will not permit continuation of such functions. To meet the requirement of fair indemnification for the taking of community facilities the courts have developed the "substitute facilities" measure of compensation.

■ There has been a certain amount of confusion in the literature on condemnation with respect to use of the "substitute facilities" terminology as a measure of "valuation" rather than of "fair compensation." It should be apparent that the cost of substitute facilities in most instances will have no relationship to "valuation." Indeed, the Second Circuit in United States v. Certain Property, 403 F.2d 800, 803 (2d Cir. 1968), and the Ninth Circuit in California v. United States, 395 F.2d 261, 266 (9th Cir. 1968) have made it clear that even in those comparatively rare instances where there is a market value for the community facility taken (for example a possible sale of a public building for private use) the government's duty to indemnify is to provide the cost of a more expensive public substitute facility. The difference between the market value in a private use market, and the cost of a public substitute facility often will result from the fact that more stringent building codes will apply to the new public facility even though the old might have continued in use. The community entity is entitled to be made whole, and making it whole means more than forcing it to abandon its non-profit community use and accept what it could obtain in the marketplace from a profit motivated purchaser. Simply stated this method insures that sufficient damages will be awarded to finance a replacement for the condemned facility. Nothing less would afford just compensation. And since the owner of a facility devoted to a non-profit, public use has a proprietary as well as a community interest in it, if the fair market value exceeds the cost of the substitute facility, such an owner should be entitled to the higher of the two measures of compensation.

■ The government urges that no operator of a public non-profit facility other than a governmental entity under a legal obligation to replace a condemned facility should be entitled to indemnification to the extent of the substitute facilities measure of just compensation. See, e. g., United States v. Wheeler Township, 66 F.2d 977, 985 (8th Cir. 1933); cf. United States v. Certain Lands, 246 F.2d 823, 824 (3d Cir. 1957). But such a holding would produce the anomalous result that the federal government's fifth amendment duty of fair compensation, which would seem to be equally applicable throughout the country, would vary according to the vagaries of local law. We prefer the approach of the Second Circuit, which recognizes that the decision to replace a facility may involve discretionary determinations as to community need, and that fair compensation for a structure reasonably necessary to public welfare means "compensation . . . measured not in terms of 'value' but by the loss to the community occasioned by the condemnation." United States v. Certain Property, supra, 403 F.2d at 804.

The government also urges that the substitute facilities measure of just compensation is totally inapplicable to any condemnee other than a governmental entity. This position was accepted by the district court. No Supreme Court or court of appeals decision has ever considered that issue. Those federal cases which have applied the substitute facilities measure all have involved governmental condemnees.[2] A leading state

2. E. g., United States v. Certain Property, 403 F.2d 800 (2d Cir. 1968); United States v. Certain Land, 346 F.2d 690 (2d Cir. 1965); United States v. Bd. of Educ. of Mineral County, 253 F.2d 760 (4th Cir. 1958); United States v. Certain Lands, 246 F.2d 823 (3d Cir. 1957); State of Washington v. United States, 214 F.2d 33 (9th Cir. 1954); City of Fort Worth v. United States, 188 F.2d 217 (5th Cir. Auth., 146 F.2d 564 (6th Cir. 1945). See generally, Note, Just Compensation and the Public Condemnee, 75 Yale L.J. 1053 (1966).

court case which considered the condemnation of privately owned non-profit community facilities held that the substitute facilities measure of just compensation is equally applicable to these private facilities as to those operated by a governmental unit. Newton Girl Scout Council Inc. v. Massachusetts Turnpike Authority, 335 Mass. 189, 138 N.E.2d 769 (1956); *cf.* Pleasant Hill v. First Baptist Church, 1 Cal.App.3d 384, 397 n. 1, 82 Cal.Rptr. 1, 7 n. 1 (Ct.App.1969); First Baptist Church v. Nebraska, 178 Neb. 831, 135 N.W.2d 756 (1965); Assembly of God Church v. Vallone, 89 R.I. 1, 150 A.2d 11, 15–16 (1959); Jahr, Eminent Domain §§ 83–84, at 117–18 (properties of non-profit organizations); Note, 37 B.U.L.Rev. 495 (1957).

■ For several reasons we think the government's position with respect to private owners of non-profit community facilities is untenable. In the first place we are dealing with the measure of the duty of indemnification imposed by the "taking clause" in the fifth amendment:

> "nor shall *private* property be taken for public use, without just compensation." (emphasis supplied).

In view of the express reference to *private* property and the absence of any reference to public property, it is inconceivable that the framers of the amendment intended to impose a greater obligation of indemnification on the national government toward the states and their subdivisions than toward private owners. One might argue that the reference to "private" property in the fifth amendment's taking clause, and in the almost universal state constitutional clauses limiting the eminent domain power,[3] means that the clause simply was not intended to protect "community" rather than private values. But we have long since passed that point, and the government concedes that it must pay substitute facilities values when it condemns community facilities owned by a governmental entity. We are not dealing with congressional largess toward governmental entities, which might justify a distinction between the measure of fair compensation for governmental and for non-governmental community facilities. Rather we are dealing with judicial interpretation of the taking clause. Accepting the interpretation that it protects the value of community uses, there is no basis for distinguishing between governmental and private community uses. Moreover acceptance of the appellee's position would inevitably put the government in a posture in which, for economic reasons, it would be forced into unfortunate and possibly discriminatory choice-of-location decisions. One can envision for example, the choice between a highway route traversing land occupied by a private or a public university; the condemnation for emergency office use of a parochial school or a public school; the destruction of a church rather than a city hall to permit the building of a federal courthouse. It seems to us an impermissible suggestion that the fifth amendment puts the government in the position of making such choices on the basis that it would be required to pay less by way of fair compensation to the private owners of such community facilities.[4]

Finally, we note that in Brown v. United States, 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923), a case upholding the constitutionality of a statute which authorized the government to condemn additional land adjacent to land to be flooded by a dam and reservoir project as a substitute site for the purpose of relocating the town of American Falls, Idaho, the Court said:

> "A town is a business center. It is a unit. If three-quarters of it is to be destroyed by appropriating it to an exclusive use like a reservoir, all property owners, both those ousted and those in the remaining quarter, as well as

---

**3.** 1 Nichols on Eminent Domain § 1.3, at 1–78 to 1–83 (rev. third ed. 1974).

**4.** Such an interpretation of the fifth amendment would have first amendment overtones.

*See generally,* Comment, The Lord Buildeth and the State Taketh Away—Church Condemnation and the Religion Clauses of the First Amendment, 46 Colo.L.Rev. 43 (1974).

the State, whose subordinate agency of government is the municipality, are injured. A method of compensation by substitution would seem to be the best means of making the parties whole." 263 U.S. at 82–83, 44 S.Ct. at 94.

No distinction was drawn in Brown v. United States between public and private owners. All were to be relocated in substitute facilities. Although the holding deals with condemnation for the purpose of making the substitution, the case is frequently cited as the genesis of the substitution of facilities method of measuring fair compensation. *See, e. g.,* United States v. Certain Property, 403 F.2d 800, 803 (2d Cir. 1968).

We conclude that the substitution of facilities measure of fair compensation is available to private owners of non-profit community facilities as well as to public owners of such facilities, in appropriate cases. In the preliminary stage in which the case is before us we have no occasion to decide whether this is an appropriate case.

The order appealed from will be reversed.