434 A.2d 695

**CITY OF CHESTER, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1980.

Decided July 14, 1981.

Peter J. Nolan, Media, for appellant.

Edward D. Werblun, Asst. Atty. Gen., for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

This appeal is from an order of the Commonwealth Court, reversing an order of the Court of Common Pleas, Delaware County, which had confirmed a report filed by the Board of Viewers.

The instant controversy involves the condemnation of approximately four and one-half acres of Crozer Park, a municipal park owned by appellant, the City of Chester. The land had been condemned by appellee, the Commonwealth of Pennsylvania, Department of Transportation, for the construction of access ramps to an existing interstate highway, I–95. To adequately understand the problems involved, however, we must give a factual narrative dating back to 1959.

In that year, PennDot condemned a portion of Crozer Park for the original construction of I–95. At the time of the original condemnation, Crozer Park was dissected by

railroad tracks of the Baltimore & Ohio Railroad which ran through the park in an east-west manner. The railroad tracks ran through the park on a grade substantially lower than the rest of the park. In the late 1800's, the B & O had built a timber bridge which connected a small southern portion of the park to the much larger northern section of Crozer Park by way of Finland Drive, the main road through the entire park. The construction of I-95 was accomplished by a deep excavation of the condemned land; I-95 runs through the park parallel to the railroad tracks directly south of said tracks. At the time of the original construction of I-95, the city was paid appropriate damages; in connection therewith, PennDOT had constructed a bridge over I-95 which was also a portion of Finland Drive. One proceeding north on Finland Drive from the southern entrance of the park would thus first cross the I-95 bridge and would immediately thereafter cross the B & O timber bridge to reach the northern section of Crozer Park.

Crozer Park contains, *inter alia*, a swimming pool, baseball diamonds, football fields, running tracks, picnic areas, and large wooded areas. Near the southern entrance to the park, at Finland Drive and Concord Road, are located the athletic facilities of Chester High School. The area surrounding the southern entrance of the park is predominantly residential. The main access for these families to the larger northern area of Crozer Park was by way of Finland Drive.

In 1972, the city engineer, Charles Catania, closed the B & O bridge because fires to the structure had, in Catania's opinion, made the bridge unsafe for either vehicular or pedestrian traffic. The city was unsuccessful in attempts to get the B & O to repair the structure. Thus, at the time of the 1974 condemnation involved instantly, the two sections of Crozer Park could not be reached by Finland Drive.

When the instant declaration of taking was filed in 1974, PennDOT's plans did not indicate that the bridge over I-95 was to be condemned. Nevertheless, in 1976, PennDOT demolished the I-95 span.

During 1977, litigation ensued before the state Public Utility Commission. The B & O was seeking approval to remove its timber bridge which had been closed since 1972. Following a hearing before an administrative law judge and review before the PUC, the railroad was given permission to demolish the bridge. As the Commission stated in its order of January 9, 1978:

"Since removal of the other bridge over Interstate Highway 95, the subject bridge does not provide access to Crozer Park from Chester. Furthermore, PennDot has testified that it has no plans to rebuild the connecting bridge and the record shows that there are alternative access routes to the park which are reasonably available."

PennDOT maintains that the city has never appealed from the decision of the PUC.

A hearing on the 1974 condemnation was held, in April of 1978, before the Board of Viewers. Various witnesses called by the city testified about the unity of use relating to all of Crozer Park. Since the city was seeking the replacement cost of the bridge as an element of its damages, it introduced into evidence a September, 1975, cost estimate which forecast the cost of replacing the bridge at $874,361. PennDOT's real estate expert, Richard DeGrouchy, estimated the fair market value of the four plus acres of land condemned at $41,100. Following the hearing, the Board of Viewers made the following findings of fact and conclusions of law:

"1. The evidence produced at the hearing indicated that there was a unity of use between the Finland Drive-Concord Avenue section of Crozer Park and the larger section of the Park.

"2. From the evidence presented, it is determined that the bridge over I-95 was not closed on the date of the condemnation, August 16, 1974, and the testimony also indicated that the public used the bridge until it was demolished by the Condemnor.

"3. The Condemnor's plans, on which its taking is based, do not show the demolition or elimination of the bridge over I-95, and therefore the cost of the replacement of the

bridge was an element of the damages considered by the Jury of View."

Based on the above, the Viewers awarded the city damages of $939,000, said figure including the replacement cost of the I-95 bridge.

PennDOT appealed from the Viewer's report to the Court of Common Pleas, Delaware County, pursuant to § 517 of the Eminent Domain Code which provides:

"All objections, other than the amount of the award, raised by the appeal shall be determined by the Court preliminarily. The Court may confirm, modify, change the report or refer it back to the same or other Viewers. A decree confirming, modifying or changing the report shall constitute a final order." Act of June 22, 1964, P. L. 84, Art. V, § 517, 26 P. S. § 1-517 (Supp. 1980-81).

The Court confirmed findings # 1 and # 2, and further stated:

"[A]lthough in its third finding of fact and conclusion of law, the Jury of View finds that the plans do not show the demolition or elimination of the bridge, the finding apparently does not go far enough. The plans as submitted do not show that the bridge or the street connecting it have been condemned. It would therefore appear that as to the bridge and Finland Drive, the Commonwealth may very well be a trespasser." (footnote omitted).

PennDOT then appealed to the Commonwealth Court which reversed, holding that replacement cost for the bridge need not be included as an element of damages, because the city, by closing the B & O bridge, had destroyed any unity of use between the northern and southern sections of the park. *Commonwealth v. City of Chester*, 41 Pa.Cmwlth. 422, 399 A.2d 1138 (1979). We granted the city's petition for allowance of appeal and this appeal followed.

Before reaching the merits of the instant appeal, we must first dispose of one procedural matter raised by the city. At the hearing before the Board of Viewers, the city argued *inter alia*, that § 605 of the Eminent Domain Code permitted the replacement cost of the I-95 bridge to be considered as

an element of damages resulting from the instant taking. That section provides:

"Where all or part of several contiguous tracts owned by one owner is condemned or a part of several non-contiguous tracts owned by one owner which are used together for a unified purpose is condemned, damages shall be assessed as if such tracts were one parcel." Act of June 22, 1964, P. L. 84, Art. VI, § 605, 26 P. S. § 1–605 (Supp. 1980–81).

The city presented witnesses who testified that the park was used as a unit and that the I–95 bridge was the primary means of access to the northern section of the park for families living to the south of Crozer Park. This being the case, the city cited § 705 of the Eminent Domain Code, which provides:

"A qualified valuation expert may testify . . . in detail as to the valuation of the property on a comparable market value, reproduction cost, or capitalization basis, which testimony may include but shall not be limited to the following:

\*        \*        \*        \*        \*        \*

"(v) the cost of adjustments and alterations to any remaining property made necessary or reasonably required by the Condemnation." 26 P. S. § 1–705

(Supp. 1980–81).

The Board of Viewers agreed with the argument advanced by the city and, pursuant to the aforementioned findings of fact and conclusions of law, held that replacement cost of the bridge was an element of the damages. The Court of Common Pleas affirmed the report of the Viewers. The Commonwealth Court, however, reversed, finding that the evidence presented to the Viewers did not sustain a finding of unity of use of the entire park. The city thus argues that the Commonwealth Court's decision has denied the city its right to a trial *de novo* by usurping the fact finding function of the trial court. Although we disagree with the Commonwealth Court's resolution of the question, we believe that tribunal did not exceed its authority in making the decision.

As previously mentioned, § 517 of the Eminent Domain Code provided:

"All objections, other than to the amount of the award, raised by the appeal shall be determined preliminarily. . . . A decree confirming, modifying or changing the report shall constitute a final order." 26 P.S. § 1–517 (Supp.1980–81).

The city argues that only pure questions of law may be decided on appeal from the Viewer's report and admittedly, the instant decision involved mixed questions of fact and law. We do not agree, however, with the city's restrictive reading of § 517.

In *Hershey v. Exxon*, 20 Pa.Cmwlth. 537, 342 A.2d 497 (1975), the court stated:

"Section 517 requires that *the court preliminarily* decide questions not involving the amount of an award, but it does not require or authorize a court to resolve factual issues without the benefit of all relevant evidence. Because the statute is silent on the method to be used by the court in resolving factual issues, the procedure for any given case is within the discretion of the trial judge. The judge may resolve factual questions by obtaining stipulations, by reference to a transcript of the evidence presented to the Board of View, by a separate evidentiary hearing prior to trial, or by evidence adduced at trial but not submitted to the jury. As long as the method used is fair to all of the parties, the alternative chosen by the trial judge is solely a matter of discretion. The important thing is that no objections which involve a question of fact be decided without an orderly fact finding process." *Id.*, 20 Pa.Cmwlth. at 543, 342 A.2d at 500–501.

We are in complete agreement with the above quoted pronouncement; the trial court instantly reviewed the evidence presented to the Board of Viewers and confirmed the findings of fact and conclusions of law of the Board. As that order was a final order, it was thus appealable to the Commonwealth Court. Just as the trial court may decide mixed questions of fact and law, so may an appellate court

review those decisions. *Compare Redevelopment Authority v. Wabank*, 34 Pa.Cmwlth. 1, 382 A.2d 785 (1978) (determination by trial court that Assembled Economic Unit Doctrine did not apply to the facts of the case). Although we disagree with the Commonwealth Court's decision that the facts in this case are such that PennDOT need not pay to replace the I–95 bridge, we must reject the city's contention that Commonwealth Court exceeded its authority in making said decision.

The city next argues that Commonwealth Court erred in holding that the replacement cost of the I–95 bridge need not be included in the damages resulting from the instant taking. While we believe that such costs may be included, we are unable, on this record, to make such a determination. We thus must remand for an evidentiary hearing because of the reasons hereinafter set forth.

The Pennsylvania Constitution provides:

"... nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa.Const., Art. 1 § 10.

In *Pennsylvania Turnpike Commission Land Condemnation Case*, 347 Pa. 643, 648, 32 A.2d 910, 913 (1943), this Court stated:

"The Poor Districts were and the Counties and the Institution Districts are state agencies performing governmental functions; subject to constitutional limitations not involved in this case, the Commonwealth has absolute control over such agencies with power to add or subtract from the duties to be performed by them or to abolish them *and take the property used for public purposes without compensating the agency therefor: Chester County Institution District v. Commonwealth*, 341 Pa. 49, 17 A.2d 212; *Poor District Case (No. 2)*, 329 Pa. 410, 414, 196 A. 837; *Philadelphia v. Fox*, 64 Pa. 169, 181; *Hunter v. City of Pittsburgh*, 207 U.S. 161 [28 S.Ct. 40, 52 L.Ed. 151], affirming *Pittsburg's Petition*, 217 Pa. 227, 66 A. 348; *Commonwealth v. Moir*, 199 Pa. 534, 541, 49 A. 351." (citations omitted) (emphasis added).

For the reasons set forth, we find that none of the above cited cases is controlling on the question of whether Penn-DOT must compensate the city for a bridge taken in an eminent domain proceeding.

In *Philadelphia v. Fox, supra* at 180, this Court stated: "[The City of Philadelphia] is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government—essentially a revocable agency—having no vested right to any of its powers or franchises—the charter or act of erection being in no sense a contract with the state—and therefore fully subject to the control of the legislature, who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangement, or destroy its very existence, with the mere breath of arbitrary discretion."

It is important, however, to view this language in the context of the question being decided. Prior to the litigation involved, numerous individuals had bequeathed sums of money and other property in trusts of which the City of Philadelphia was trustee to use for public purposes. The legislature then created a Board of Trusts, as opposed to the city itself, to administer these charitable public trusts. The Court thus held that the legislature had the power to create the Board of Trusts; we must note, however, that the property in question was still being used for the benefit of the city itself.

In *Commonwealth v. Moir, supra*, this Court was presented with a constitutional challenge to an act relating to all cities of the second class. After citing the above quoted language of *Philadelphia v. Fox, supra*, the court went on to hold that despite various difficulties created by the legislation, no constitutional violations were shown and the difficulties mentioned would have to be rectified by the legislature. Again, the case has no bearing on the question presented instantly.

In *Pittsburg's Petition, supra*, the Court cited both *Philadelphia v. Fox, supra*, and *Commonwealth v. Moir, supra*, in deciding that the legislature had not acted in an unconstitu-

tional fashion in setting up a procedure whereby the voters of the cities of Pittsburgh and Allegheny voted to annex the latter into the former. Again, all municipal functions were still being provided to the residents of the two cities, albeit in a different form and no taking requiring compensation occurred because of the actions. In affirming the decision of this Court, the United States Supreme Court stated:

> "The State . . . may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, . . . repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States." *Hunter v. Pittsburgh, supra,* 207 U.S. at 178–179, 28 S.Ct. at 46.

In *Poor District Case (No. 2), supra* at 414–15, 196 A. at 840, the Court stated:

> "The property of the district as well as its life is within the control of the legislature. Had the General Assembly abolished the district and not transferred its functions to another agency, its property would have vested automatically in the state, subject to its absolute control *so long as not diverted from public use. Meriwether v. Garrett,* 102 U.S. 472, 513 [26 L.Ed. 197].
>
> When the legislature transfers the functions, and annexes the territory of one municipal corporation to another, the property of the municipality annexed vests ipso facto in the consolidated unit: *Mount Pleasant v. Beckwith,* 100 U.S. 514, 528 [25 L.Ed. 699]: see, *D'Esterre v. City of New York,* 104 F. 605, 611; 1 Dillon, Municipal Corporations (5th Ed.), section 357." (emphasis added).

In this case, the legislature had abolished the poor districts within the city of Philadelphia and transferred their former functions to the city's Department of Public Welfare. A similar result was reached in *Chester County Institution*

*District v. Commonwealth, supra,* where the legislature transferred property used for mental hospitals from the county institution districts to the state. In both cases, no compensation was necessary because all that occurred was a change in what body would provide the services in question.

For the reasons already stated, we find no precedential value in the above discussed cases to the instant controversy. Further, and even more importantly, none of these cases involved a taking under the Eminent Domain Law then applicable.

*Pennsylvania Turnpike Commission Land Condemnation Case, supra,* did involve a taking using eminent domain. There, however, the land condemned had been transferred, pursuant to the legislation discussed in *Chester County Institution District,* from the Somerset County Institution District to the state. Despite said transfer, the Somerset County Institution District was still occupying the land and using it for public purposes. Given a strict reading, this case stands for nothing more than the proposition that *the state need not compensate itself when it puts its property to a different public use* !

Our research indicates that the first time this Court was presented with the question posed instantly—i. e., must the Commonwealth compensate a political sub-division for property taken by eminent domain?—was in *Speers Borough School District v. Commonwealth,* 383 Pa. 206, 117 A.2d 702 (1955). There, the Commonwealth had condemned property of the school district for highway slope purposes. The Court stated:

> "Constitutional prohibitions against the taking of property without compensation apply only to privately owned property.... Therefore it has always been held that the Commonwealth may take property of a political subdivision or agency without payment therefor, ... the right to compensation in such cases being only a matter of grace or allowance by the Legislature." *Id.,* 383 Pa. at 208–09, 117 A.2d at 703. (citations omitted).

Despite this language, the court reviewed the applicable laws and determined that the school district qualified as an "owner," thus being entitled to compensation. As the Court went on to state:

> "The school district satisfies all of the requirements of status as 'owner,' according to its 'common and approved usage', and must be compensated for its loss. To hold otherwise would lead to a highly absurd and, to the district, costly results. We cannot believe, for example, that school buildings costing many thousands of dollars can be destroyed for highway purposes and yet the Legislature not have intended that the loss be paid to the district. The Act imposed upon the Commonwealth *liability for payment to all owners*, including the school district. *Id.*, 383 Pa. at 210, 117 A.2d at 703–704 (emphasis added).

■ In one sense, we are presented with a question of first impression, as this Court has never been called upon to decide if the Commonwealth must compensate a city for roads or bridges taken in a condemnation proceeding. The bridge in question, however, existed primarily for the use of the residents of the city. By closing the bridge, the Commonwealth has taken from those residents a means of access to Crozer Park, thus depriving them of something that did exist prior to the taking in this case.

Interestingly, the United States Constitution provides:

> ". . . nor shall private property be taken for public use, without just compensation."

U.S.Const., Amend. V. So while our federal Constitution also speaks only of "private" property, numerous decisions have held that United States must compensate the states or lesser political subdivisions for public land taken generally and highways and bridges specifically. *See,* Annotation, 40 A.L.R.3d 143 and cases cited therein. As we believe the loss suffered by residents of any political subdivision from the taking of a road or bridge is no less real than the loss suffered by private individuals as condemnees, we hold that the Pennsylvania Constitution does not allow the Common-

wealth to escape its financial obligation owed to a public condemnee for property taken.

█ Having determined that the city may well be entitled to compensation for the bridge, we must now look to how said compensation will be measured. The city argues, and quite persuasively in our view, that the general rule concerning damages, i. e., fair market value for the property taken, is simply unworkable in this case. Fair market value has oft been described as the price a willing buyer would pay a willing seller for the property in question. Common sense alone would indicate that the normal rule cannot work where the property in question is a bridge which was formerly an integral part of a public road system. As a result, the city argues that the only way it can be truly compensated for its loss would be for PennDOT to pay for the replacement cost of the I-95 bridge. We agree with the city and find that the condemned bridge has no ascertainable fair market value by which to measure the instant damages.[1]

Although only one case decided by this court has allowed the cost of replacement facilities, *Pennsylvania Gas & Water Co. v. Pennsylvania Turnpike Commission*, 428 Pa. 74, 236 A.2d 112 (1967), such a concept is by no means foreign to American jurisprudence. The United States Supreme Court has never decided whether the Eminent Domain provision of the United States Constitution requires compensation in the form of the cost of replacement facilities; that Court, however, has stated:

"The instances in which market value is too difficult to ascertain generally involve property of a type so infrequently traded that we cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property. See, *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, [338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949)]; *United States v. Miller*, 317 U.S. [369, 374–375, 63

1. The following analysis on the substitute facilities approach is applicable only after it has been determined that the condemned property has no ascertainable fair market value.

S.Ct. 276, 280, 87 L.Ed. 336 (1943)]. *This might be the case, for example, with respect to public facilities such as roads or sewers."* *United States v. 564.54 Acres of Land,* 441 U.S. 506, 513, 99 S.Ct. 1854, 1858, 60 L.Ed.2d 435 (1979) (emphasis added).

Since the property in question was a church camp, the Court found that a market for such property existed, even though the market would be limited. Nonetheless, seven members of the Court joined in the above quoted language.

Despite the lack of decisions on this issue by the United States Supreme Court, there is no such paucity of cases in the various Circuit Courts of Appeals, and we believe those decisions to be particularly instructive. As one court has accurately summarized existing case law:

". . . just compensation under the Fifth Amendment for the federal taking of public streets of a local community by eminent domain may be supplied by providing 'substitute facilities.' 4A *Nichols on Eminent Domain* § 15.2 (3d ed. 1975). Under the 'substitute facilities' doctrine, developed by the courts since *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923) (dictum), the compensation due a local community for a taking of public facilities is the cost of supplying whatever substitute facilities are reasonably necessary to enable it to serve its constituents in as adequate a manner as it would had the condemnation not occurred. *City of Fort Worth v. United States,* 188 F.2d 217, 222 (5th Cir. 1951); *United States v. Arkansas,* 164 F.2d 943 (8th Cir. 1947). Use of this principle in place of the conventional fair market value concept of determining compensation relieves public condemnees of hardships they would otherwise face due to the absence of a market for streets and similar public facilities. *United States v. Certain Property,* 403 F.2d 800, 802–03 (2d Cir. 1968). And if it is necessary to provide substitute roads to replace and utilize the uncondemned portion of the viable entity, the federal government, as condemnor, should construct or supply the cost of constructing the necessary substitute roads, regardless of whether that cost be great-

er or less than the value of the roads taken. *United States v. Des Moines County*, 148 F.2d 448 (8th Cir.), *cert. denied*, 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444 (1945).

"By the same token, however, the federal government as condemnor enjoys the corresponding mitigating principle that it must furnish only substitute facilities that are *reasonably necessary* in the circumstances. *Washington v. United States*, 214 F.2d 33, 40 (9th Cir.), *cert. denied*, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954); *United States v. Des Moines County, supra.* If none are reasonably necessary, no compensation is allowed. *United States v. City of New York*, 168 F.2d 387, 389 (2d Cir. 1948). Thus, if a decrease in population has relieved the municipality of a burden of providing as many streets, it has suffered a correspondingly reduced loss by condemnation and is entitled to only as much compensation as is reasonably necessary to meet its present needs." *United States v. Streets, Alleys & Public Ways, Etc.*, 8 Cir., 531 F.2d 882, 885–86 (emphasis in original).

We find the reasoning used persuasive and thus adopt it for use in this Commonwealth.

We need not solely rely on the above quoted language to decide the question presented instantly. The Eminent Domain Code provides:

"Whether at the hearing before the viewers, or at the trial in court on appeal:

\* \* \* \* \* \*

"(2) A qualified valuation expert may testify on direct or cross examination in detail as to the valuation of the property on a comparable market value, *reproduction cost* or capitalization basis, which testimony may include but shall not be limited to the following:

\* \* \* \* \* \*

"(v) The cost of adjustments and alterations to any remaining property *made necessary or reasonably required by the condemnation.*"

Act of June 22, 1964, P.S. 84, Art. VII, § 705, 26 P.S. § 1–705 (Supp.1980–81) (emphasis added).

Furthermore, in *Pennsylvania Gas & Water Co. v. Pennsylvania Turnpike Commission, supra,* 428 Pa. at 83, 236 A.2d at 117, this court discussed the substitute facility approach, stating:

> ". . . the water company would like to be able to purchase another tract suitable for reservoir purposes, or in the alternative, to erect a retaining wall on their existing tract which would enable them to construct a reservoir of the same size as that originally planned. In view of the somewhat unique circumstances of this case, we feel that appellant's prayer is not without merit. The water company is a public utility with monopolistic privileges within its own territory. Because of this, there simply does not exist a market, in the classic sense, for reservoir property. It is not traded between water companies. Furthermore, as a public utility, appellant has not only the privilege, *but the duty, to supply its area with an adequate amount of water. To do this requires that it replace or repair the property taken by the turnpike*; and this simply cannot be done with $72,000. Finally, appellant offered to prove that in spite of the fifty years during which the condemned tract remained unimproved, the water situation in Lackawanna County demands the new construction of a new reservoir." (emphasis added).

Just as the water company had a duty to provide water to the customers in its service area, the city has an obligation to provide roads and other essential services to its citizens.

Normally, then, the question of whether PennDOT must pay to replace the I–95 bridge would turn on whether such replacement is "reasonably necessary to enable [the city] to serve its constituents in as adequate a manner as it would had the condemnation not occurred." *United States v. Streets, Alleys & Public Ways, supra* at 885. This question could usually be decided by looking to the alternative routes which would be available. While the Commonwealth Court stated that the city's own witness testified that alternative means of access to the park existed, this fact does not end the inquiry. As the court stated in *City of Fort Worth v. United States, supra* at 221:

"The true test is not whether the substitute facilities already in existence will carry the traffic, diverted or non-diverted, but rather what compensation is necessary to enable the city to provide a facility which will carry the entire traffic load in an equally adequate manner as would have been true had there been no condemnation."

The instant record contains no evidence of how the existing routes into the park will allow the flow of traffic into Crozer Park. Because we are dealing with a park, it must be remembered that motorized vehicular traffic is not all that need be considered. Surely great numbers of children living at the southern entrance to the park either walk or ride bicycles to the facilities in the northern section of Crozer Park. Important areas of inquiry would thus be the time involved in using these already existing routes, the safety factor to the youngsters in using the longer routes, etc. What may be reasonable to a person using an automobile could very likely be unreasonable to a pedestrian or cyclist. In the final analysis, a span to handle the latter traffic may be all that is necessary.

PennDOT argues that the city, by closing the railroad bridge, has already destroyed the Finland Drive means of access to the park and thus, has no grounds to complain about the demolition of the I–95 bridge. The city engineer testified that the railroad bridge was closed because it was structurally unsound to handle even pedestrian traffic. The city thus had no choice in closing that bridge; in fact, it had an obligation to do so to provide for the safety of its citizens. Further, city officials testified that they had tried, without success, to get the B & O to repair the structure. Eventually, the Public Utilities Commission granted the B & O permission to remove the structure. PennDOT asserts that the city has never appealed from the commission's order; while such a fact may be relevant to the instant inquiry, it is by no means dispositive. Even assuming no appeal was taken (and there is simply no way to ascertain this fact from this record), the city could be entitled to compensation for the taking of the I–95 bridge if the city would be willing to

spend its own funds to replace the railroad bridge in some form so that Finland Drive would again provide access to both portions of the park. We must note, however, that if no appeal were taken and if the city will not somehow replace the railroad bridge, PennDOT would be relieved of any obligation to pay for the taking of the I–95 bridge, because the permanent removal of the railroad bridge alone foreclosed any access to the northern portion of the park by way of Finland Drive from the southern section of the park. As one court has stated:

". . . if it is unnecessary to replace a road or to provide a substitute, the claimant here has suffered no money loss and has been relieved of the burden of maintaining the road taken." *California v. United States*, 169 F.2d 914, 924 (9th Cir. 1948).

Order of the Commonwealth Court is reversed and the case is remanded for further proceedings consistent with this opinion.

NIX, J., files a concurring opinion.

ROBERTS, J., files a dissenting opinion.

ROBERTS, Justice, dissenting.

I dissent. PennDOT's demolition of the bridge spanning I–95 caused the City of Chester no harm. Indeed, the demolition benefitted the City by eliminating ambulatory access to a deteriorated, dangerous railroad bridge already closed to vehicular traffic by the City. Like the unanimous Commonwealth Court en banc, I would hold that the City is entitled to no compensation for PennDOT's demolition of the I–95 bridge.

The I–95 bridge in controversy was built approximately two decades ago by PennDOT to preserve the flow of traffic on a local City street severed by I–95. This street, Finland Drive, provided residents with convenient ambulatory and vehicular access to the City's Crozer Park. With the I–95 bridge installed, residents wishing to enjoy the park could travel north on Finland Drive, crossing the I–95 bridge and

then a wooden bridge owned by the B & O Railroad spanning the railroad company's tracks. Residents could also gain access to Crozer Park by way of other city streets, approximately ten to twelve blocks from Finland Drive.

The wooden railroad bridge, built in 1885, began to deteriorate severely because of age, fires, and vandalism. In 1971, well before PennDOT's demolition of the I-95 bridge, the City engineer closed the wooden bridge to vehicular traffic. A few pedestrians continued to use the unsafe structure. Although the record indicates that the City had informally requested the railroad to make repairs to the bridge, the City took no affirmative measures to preserve the wooden bridge as a viable, safe means of access to Crozer Park.

Thus, when PennDOT demolished the I-95 bridge in 1976, it interrupted only pedestrian travel over the unsafe wooden structure. As the Commonwealth Court observed, "[t]he I-95 bridge led in effect for a number of years to a dead end."

Controlling here are this Court's cases involving a condemnor's alleged interference with access to property. It is well-settled under Pennsylvania's Eminent Domain Code that

"where the result of a condemnor's action is to compel the allegedly affected property owner to travel a short distance farther to reach the system of streets going in a specific direction, this slight inconvenience is not compensable. See. e. g., *Spang & Co. v. Commonwealth*, 281 Pa. 414, 126 A. 781 (1924); *Department of Highways Appeal (Mitchell Condemnation Case)*, 209 Pa.Super. 288, 228 A.2d 53 (1967)."

*Commonwealth v. Hession*, 430 Pa. 273, 278, 242 A.2d 432, 434 (1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 685, 21 L.Ed.2d 693 (1969). A fortiori, where as here the only result of the condemnor's action is to interrupt unsafe ambulatory access to City property, no more than a "slight inconvenience" has occurred. Indeed, because access was unsafe, the condemnor's action has, if anything, inured to the City's

benefit. An award of compensation in these circumstances is nothing short of a windfall.

The majority would depart from well-settled principles of compensation found in the Eminent Domain Code, and permit the City as much as $875,000, on the ground that the City "has an obligation to provide roads and other essential services to its citizens." 434 A.2d at 703–704. See generally *Pa. Gas & Water Co. v. Pa. Turnpike Comm'n*, 428 Pa. 74, 236 A.2d 112 (1967). On this record, revealing the City's continuing failure to maintain Finland Drive as a means of access to Crozer Park, the majority's assertion in no respect supports its result. For even if the City were obliged to maintain access to Crozer Park by way of Finland Drive, the record indicates that the City has been woefully remiss in fulfilling its obligation. Surely the City should not be permitted to recover an eminent domain award where this alleged obligation has not been fulfilled.

The majority's remand for a determination of whether "the city would be willing to spend its own funds to replace the railroad bridge in some form ..." serves only to highlight its error. The Eminent Domain Code and our cases are clear that the only relevant inquiry is the "before and after" value of the property as a result of the condemnor's action. See Act of June 22, 1964, P.L. 84, § 602, 26 P.S. § 1–602(a) (Supp.1980); *Brown v. Commonwealth*, 399 Pa. 156, 159 A.2d 881 (1960). What the condemnee "would be willing" to do is irrelevant.

The unanimous Commonwealth Court en banc correctly applied the Eminent Domain Code and controlling case law and its order should be affirmed.

NIX, Justice, concurring and dissenting.

I agree the Commonwealth must compensate the City of Chester for the taking of the portion of Crozer Park in question here. However, with due deference to the opinion of the majority, its resolution of the case on constitutional grounds is neither necessary nor appropriate. The clear and unambiguous language of Article 1, § 10 of the Pennsylva-

nia Constitution [1] has no applicability to the taking of public property as is in issue here.[2] Although the result reached is a correct one, the damage wrought by the analysis employed far outshadows that accomplished by the result.

Accordingly, the question of whether or not compensation is due for a taking of property owned or administered by a local government is a question of statutory construction in this jurisdiction. *Speers Borough Sch. Dist. v. Commonwealth*, 383 Pa. 206, 117 A.2d 702 (1955). The essence of *Speers* is that there is no constitutional prohibition against a legislative provision for compensation for the taking of property owned by a political subdivision, if so deemed by an appropriate state. *Speers* also provides that a statute granting a right to compensation for a taking is to be construed as encompassing the taking of public property as well as private property unless a contrary intention is expressly provided in the statutory provision being examined.

The problem in the instant case is essentially one involving an interpretation of the Eminent Domain Code of 1964, Act of June 22, P.L. 84, Art. § 601, 26 P.S. § 1–601 (Supp. 1980). The Eminent Domain Code does not contain any provision specifically stating compensation shall be paid only to private owners of property. The City of Chester meets

1. Article 1, § 10 of the Pennsylvania Constitution provides in pertinent part:
   ... nor shall *private property* be taken ... without just compensation being first made or secured. [Emphasis added.]

2. There is some authority for the view that municipal property held for proprietary purposes may fall within the constitutional ban against the taking of *private property* without payment of just compensation. *See e. g., In re Acquisition of Water System*, 372 Pa. 424, 428, 93 A.2d 437, 439 (1953); *Shirk v. Lancaster City*, 313 Pa. 158, 163, 169 A. 557, 559–60 (1933). Experience has shown that utilization of the distinction between "proprietary capacity" and "governmental capacity" has created more problems than it has solved. I believe such an analysis is fictional as well as unnecessary and should not be employed.

all the requirements of status of "condemnee"[3] as required by the Code and must be "justly compensated' for any loss.[4]

Appellant lost a unity of use which had existed between the Finland Drive—Concord Avenue section of Crozer Park and the larger section of the Park. The citizens of Chester, to whom the municipality owes a duty, were deprived of reasonable access to a public park by the demolition of the bridge. The assertion that the wooden railroad bridge remained closed and unavailable for public use was "justified" because of the condemnation is specious reasoning. There was a loss of a facility necessary for the public welfare.

As the majority indicates, if the measure of damages, in such a situation, is fair market value, appellant will not have been justly compensated. While the Eminent Domain Code sets forth various methods for reaching the measure of damages for just compensation, the methods enumerated are not exclusive. The destruction of the unity of use and the city's obligation to its citizens more than warrants the adoption in this Commonwealth of the "substitute facilities doctrine", previously applied in numerous Circuit Courts of Appeals.[5]

Once the substitute facilities doctrine comes into play, the compensation due a local community for the taking of a public facility should be "the cost of supplying whatever substitute facilities are reasonably necessary to serve its constituents in as adequate a manner as it would had the condemnation not occurred." *City of Fort Worth v. United*

3. " 'Condemnee' means the owner of a property interest taken, injured or destroyed, but does not include a mortgage, judgment creditor or other lienholder." 26 P.S. § 1–201.

4. "The condemnee shall be entitled to just compensation for the taking, injury or destruction of his property, . . . ." 26 P.S. § 1–601.

5. *See* cases cited on pages 17, 18 of the majority opinion, *supra. Cf.* also *Jefferson County v. Tennessee Valley Authority*, 146 F.2d 564, *cert. denied* 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425 (1945); *Pennsylvania Gas & Water Co. v. Pennsylvania Turnpike Commission*, 428 Pa. 74, 236 A.2d 112 (1967). *See generally*, Eminent Domain: Cost of Substitute Facilities as Measure of Compensation Paid to State or Municipality for Condemnation of Public Property, 40 A.L.R.3d 143.

*States,* 188 F.2d 217, 222 (5th Cir. 1951); *United States v. Arkansas,* 164 F.2d 943 (8th Cir. 1947). Just compensation for a political sub-division entitled to an award for a taking must be replacement value in order to give meaning to the reasons for granting any award. For these reasons, replacement cost for the bridge is required as an element of damages.

I agree that the order of the Commonwealth Court should be vacated, but I disagree that there is a need for the taking of further testimony in this matter. I believe the present record clearly supports the order entered by the Common Pleas Court.