Jeffrey T. PETOW, I. Wistar Morris, III, Martha H. Morris, William M. Davison, IV, Paul Spears, Elizabeth W. Stick, J. William Warehime, Jeffrey Herr, as Custodian for his Daughter, Julie Herr, Warehime Enterprises, Stephen Port, Norman S. Wildasin, Howard C. Pizer, Reuel H. Zinn and Evelyn H. Zinn

v.

John A. WAREHIME, Clayton J. Rohrback, Jr., James G. Sturgill, Arthur S. Schaier, T. Edward Lippy, the Estate of George E. Lawrence, Deceased and Cyril Noel

v.

Hanover Food Corporation.

**Appeal of Jeffrey T. Petow.**

Superior Court of Pennsylvania.

Argued April 6, 2010.

Filed May 25, 2010.

---

David A. Mills, York, for appellant.

Grant S. Palmer, Philadelphia, for Rohrbach, Sturgill, Schaier and Lippy, appellees.

BEFORE: BENDER, PANELLA and LAZARUS, JJ.

OPINION BY BENDER, J.:

¶ 1 Jeffrey T. Petow, I. Wistar Morris, III, Martha H. Morris, William H. Davidson, IV, Paul Spears, Elizabeth W. Stick, J. William Warehime, Jeffrey Herr, as custodian for his daughter, Julie Herr, Warehime Enterprises, Stephen Port, Norman S. Wildasin, Howard C. Pizer, Reuel H. Zinn and Evelyn H. Zinn (collectively "Petow") appeal from the order entered June 24, 2009, denying Petow's petition for attorney fees in his suit against John A. Warehime, Clayton J. Rohrback, Jr., James G. Sturgill, Arthur S. Schaier, T. Edward Lippy, the Estate of George E. Lawrence, deceased and Cyril Noel (collectively "Defendants"). We affirm.

¶ 2 To provide background for our decision in this case, we find it necessary to reproduce the Supreme Court's recitation of the facts that it formulated for its decision in *Warehime v. Warehime*, 580 Pa. 201, 860 A.2d 41 (2004) (*Warehime III*):

This matter involves an intra-family dispute over the control of Hanover Foods Company ("HFC"). The factual and procedural history is remarkably complex. In brief, Alan Warehime ("Alan") was the chairman and chief executive officer ("CEO") of HFC from 1956 to 1989. Alan was the father of three chil-

dren John Warehime ("John"), Michael Warehime ("Michael"), and Sally Warehime ("Sally"). In 1988, Alan created two voting trusts, one with his children and the other with his five grandchildren. Alan was designated as the sole voting trustee for both trusts. By their terms, both trusts were due to expire in 1998, ten years after their creation.

In 1989, John was appointed chairman and CEO of HFC. John gained further control over HFC when, upon Alan's death in 1990, he became the voting trustee of both trusts and acquired control over the majority of the voting shares of the corporation.

Following John['s] becoming the voting trustee of the voting trusts, several other family members expressed unhappiness over the way John was running HFC; boardroom disagreements escalated. In 1994, John eliminated cumulative voting rights, thus effectively preventing anyone other than himself from electing any members of the board. Promptly after the elimination of cumulative voting rights, John removed Michael, Sally, and an independent director from the Board; he replaced them with three hand-picked directors of his own choosing.

The removal of Michael and Sally did not, however, end the internecine disputes. Various actions were filed against John and HFC by Michael, Sally, and other shareholders. Michael and Sally also made it known that they were interested in removing John as the chairman of the board of HFC as soon as John lost control of the majority of HFC's voting stock upon the expiration of the voting trusts in 1998.

Viewing this potential change in corporate management as a negative, several members of John's hand-picked Board formed a body which they termed the "Independent Directors Committee" and drafted a plan ("the Plan").

. . . .

The net effect of this Plan was that in the event of a dispute among Warehime family members, a majority of the Class B shareholders would not be able to determine the outcome of a vote for a period of five years after the Plan was created. Rather, John, John's children, and John's hand picked directors would be in control of 50.06% of the vote. Accordingly, the Plan created just enough votes to ensure that John, John's children, and the directors hand-picked by John would retain control over the corporation for years after the voting trusts expired. On February 13, 1997, notice was sent to HFC shareholders, informing them that there would be a vote on the Plan on February 24, 1997.

On February 21, 1997, Michael filed an action in equity against John, requesting preliminary injunctive relief; it is this action which is the subject of the instant appeal. Michael requested that the trial court enjoin the convening of the February 24, 1997 shareholder meeting or, in the alternative, enjoin John from voting the voting trust shares in favor of the Plan.

The trial court held a hearing. Following the hearing, the trial court denied Michael's request for preliminary injunctive relief. As the cornerstone for its opinion, the trial court stated that the impending expiration of the voting trusts introduced what the court deemed to be "instability" into HFC. Tr. ct. slip op., dated 6/24/1997, at 4. In the trial court's view, this "instability" was due to the fact that upon the expiration of the voting trusts, John would no longer have control over the corporation and that other shareholders could band together and vote to remove John and all of

John's hand-picked members of the Board and replace them with a yet undetermined management. *Id.* The trial court found that this anticipated instability interfered with HFC's ability to raise equity capital and threatened HFC's corporate good health. *Id.* at 8–9.

The trial court opined that the Plan prevented such instability and thus was a positive good. Furthermore, it determined that the Plan did not present a conflict of interest between John's private interests and his duties as voting trustee. *Id.* at 34. Rather, the Plan reflected a good faith effort to serve the best interests of HFC since it assured stability in the governance structure of HFC for a five-year period. *See id.* at 41–42. Accordingly, on June 24, 1997, the request for a preliminary injunction was denied. The following day, John convened a meeting and voted all of his shares as well as all of the trust shares in favor of the Plan, and the Plan was therefore adopted.

Michael appealed to the Superior Court which reversed. *Warehime v. Warehime,* 722 A.2d 1060 (Pa.Super.1998). The court concluded that John had breached his duty of loyalty to the trust beneficiaries. We, in turn, reversed on appeal. *Warehime v. Warehime,* 563 Pa. 400, 761 A.2d 1138 (Pa.2000) ("*Warehime I*"). In *Warehime I,* we stated that since John had acted in good faith and did not act for his own personal benefit, then he did not violate his fiduciary duties as voting trustee. Accordingly, we reversed the Superior Court and remanded for that court to consider the other issues that had been raised by Michael but not addressed by the lower court.

The Superior Court on remand denied relief to Michael on all but one of his claims. *Warehime v. Warehime,* 777 A.2d 469 (Pa.Super.Ct.2001) ("*Warehime II*").

> *Warehime III,* 860 A.2d at 43–45 (footnotes omitted). However, the review by the Supreme Court again resulted in a reversal of this Court's decision upon remand as to the single issue upon which the Superior Court granted relief.

¶ 3 More central to the instant case, the Supreme Court referenced the fact that "various actions were filed against John and HFC by Michael, Sally, and other shareholders." *Id.* at 44. The matter before us involves one of those actions, namely, a shareholder's derivative action. Specifically, in September of 1996, Petow filed a complaint against John A. Warehime ("John"), and the other Defendants, alleging *inter alia* a breach of fiduciary duties, including a challenge to John's new compensation package, which had been approved by the HFC Board in 1995 and significantly increased John's salary and bonuses. Petow alleges that in response to his law suit, the HFC Board appointed a committee that in turn hired an executive compensation firm, Towers Perrin, which reviewed John's 1995 employment agreement. The compensation firm proposed amendments that would retroactively replace the 1995 compensation package. HFC's Board adopted the amendments, which Petow asserts saved HFC, at a minimum, almost $8 million dollars.

¶ 4 Meanwhile, the various *Warehime* cases continued to wend their way through the appellate courts and back to the trial court. However, it appears that the specific action before us remained dormant, except for the filing of a petition for attorney's fees in May of 2002, which was later denied. Subsequently, in 2005 the trial court listed this case for termination due to inactivity, but upon objection the matter was returned to active status. Then, again in 2007, the case was listed for termination

due to inactivity. Although Petow at first objected, he and his fellow plaintiffs withdrew their objections and agreed to the termination on May 2, 2008. However, the day before, on May 1, 2008, Petow filed a second petition for fees. On May 6, 2008, the court issued an order directing the termination of Petow's case, unaware that the second petition for fees was outstanding. A hearing took place on June 24, 2009, and thereafter, the court denied the request for attorney's fees.

¶ 5 Petow then filed this appeal, raising the following issue for our review:

> Did the Lower Court commit an error of law when the Lower Court relied on *City of Reading v. Feltman,* 127 Pa. Cmwlth. 618, 562 A.2d 926 (1989)[,] to interpret the Pennsylvania Judicial Code, 42 Pa.C.S.A. § 2503(8) to conclude Pennsylvania appellate law precludes an award of counsel fees based upon the 'substantial benefit' doctrine?

Petow's brief at 4.

¶ 6 Petow argues that the trial court erred by not assessing attorney's fees because it misinterpreted 42 Pa.C.S. § 2503(8) and incorrectly relied on *City of Reading v. Feltman,* 127 Pa.Cmwlth. 618, 562 A.2d 926 (1989), regarding the "common benefit" or "substantial benefit" doctrine. Rather, Petow suggests that *Couy v. Nardei Enterprises,* 402 Pa.Super. 468, 587 A.2d 345 (1991), should control the outcome of the issue before us.

¶ 7 We begin by noting that "a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Gall v. Crawford,* 982 A.2d 541 (Pa.Super.2009) (citing *Trizechahn Gateway LLC v. Titus,* 601 Pa. 637, 976 A.2d 474, 482 (2009)). Moreover, "[t]he applicant for counsel fees has the burden of proving his/her entitlement thereto."

*Id.* Next, we set forth this Court's overview concerning the award of counsel fees as stated in *Couy,* the case relied upon by Petow:

> It is the American rule that parties to adversary litigation are required to pay their own counsel fees. The common fund doctrine, a common law exception to this rule, has been statutorily codified at subdivision (8) of § 2503. *Jones v. Muir,* 511 Pa. 535, 515 A.2d 855 (1986). In essence, the common fund doctrine applies when an attorney's services: protect a common fund for administration or distribution under the direction of the court, or where such fund has been raised for like purpose, it [the fund] is liable for costs and expenses, including counsel fees incurred. This is the case even though the protection given or the raising of a fund results from what may be properly termed adversary litigation. *Hempstead v. Meadville Theological School,* 286 Pa. 493, 134 A. 103 (1926).
>
> In other words, when several people have a common interest in a fund, the assets of which may be created through adversary litigation, and one or more of these people, for the benefit of all, but at their own cost and expense, bring suit to administer or preserve that fund, the court will order plaintiff or plaintiffs to be reimbursed for costs and expenses, including counsel fees, from the property of the fund, or order those benefited to contribute proportionately toward that expense. *Pennsylvania Association of State Mental Hospital Physicians v. State Employees' Retirement Board,* 87 Pa.Cmwlth. 108, 483 A.2d 1003 (1984).
>
> Furthermore, 42 Pa.C.S. § 2503(8) authorizes the award of attorneys' fees to "[a]ny participant who is awarded counsel fees out of a fund within the jurisdic-

tion of the court pursuant to any general rule relating to an award of counsel fees from a fund within the jurisdiction of the court." This authorization has been taken to mean that the common fund exception applies not only when the fund is before the court prior to litigation, but where the successful litigation of the underlying suit resulted in a substantial benefit to a "group of others in the same manner as plaintiff," *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970), quoted in, *Pennsylvania Assoc., supra.*, 483 A.2d at 1007.

*Id.* at 346.

¶ 8 In discussing the "common fund" doctrine, the trial court here recognized that Petow's argument rested on "the recomputation of John Warehime's compensation package[, which Petow asserted] resulted in a substantial savings to the corporation, in effect, a 'fund' out of which [Petow] should be compensated counsel fees." Trial Court Opinion, 6/24/09, at 5. However, the trial court explained that the fund identified by Petow was not within the jurisdiction of the court and, therefore, the "common fund" doctrine as espoused in 42 Pa.C.S. § 2503(8) could not be the basis for the counsel fees that Petow was seeking. Apparently, Petow accepted the trial court's reasoning that the "fund ·was not within the jurisdiction of the court." Instead, Petow relies on the "common benefit" or "substantial benefit" doctrine, which he believes "is at the heart of this appeal." Petow's brief at 14.

¶ 9 Petow quotes extensively from *Jones v. Muir*, 511 Pa. 535, 515 A.2d 855 (1986), in which the court discussed the common benefit doctrine, a theory that the *Jones* court indicated was extrapolated from the common fund doctrine. Like Petow, we include the *Jones* court's explanation in this regard as follows:

This doctrine, which this Court has neither adopted nor expressly rejected, provides that attorney's fees may be awarded to individuals whose litigation has substantially benefitted [sic] a class of persons not participating in the litigation. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

One distinction of the "common benefit" doctrine is that it is not limited to cases involving a fund within the jurisdiction of the court. For instance, in *Hall, supra*, the theory was applied to justify an award of counsel fees assessed against a union found guilty of violating a member's right of free speech. In *Mills, supra*, the theory was similarly applied to assess fees against a corporation which had been sued by a shareholder. That suit had been brought to set aside a merger which had been induced through the use of a misleading proxy statement.

Another distinction of the "common benefit" doctrine is that it is limited to instances where the beneficiaries are small in number and easily identifiable. For example, in *Hall, supra*, the benefits accrued to members of the union who shared the expense of counsel fees through their union. In *Mills, supra*, the benefits accrued to the corporation and its shareholders who shared the expense through the corporation.[11]

---

[11] [Jones, the appellee,] also relies on *Pennsylvania Association of State Mental Hospital Physicians v. State Employees' Retirement Board*, 87 Pa.Cmwlth. 108, 483 A.2d 1003 (1984), in which the court justified an award of counsel fees from an interest reserve fund generated by the state employees retirement fund on the basis of common benefit principles. The fees were awarded for services rendered in a class action suit successfully challenging the Retirement Board's method of calculating "credited service" for

all part-time employees participating in the retirement system. There is a difficult question as to whether the Pennsylvania judiciary is empowered to apply the common benefit doctrine as in *Pennsylvania Association* where there is no statutory authorization for such an award. The awarding of counsel fees is a matter controlled by statute in this Commonwealth. 42 Pa.C.S. § 2503. Subsection (8) of Section 2503 of the Judicial Code authorizes an award of counsel fees out of a fund "within the jurisdiction of the court." While this clearly authorizes awards based upon the traditional common fund doctrine, it does not appear to authorize awards in common benefit cases not involving a fund within the jurisdiction of the court such as *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973)[,] and *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

*Jones*, 515 A.2d at 860.

¶ 10 Next, with regard to the *Feltman* case, relied upon by the trial court here, the Commonwealth Court reversed the grant of counsel fees by the trial court, concluding that the Supreme Court in *Jones* "questioned the validity of the common benefit doctrine in Pennsylvania, and directly questioned the authority of Pennsylvania courts to award counsel fees under the common benefit doctrine." *Feltman*, 562 A.2d at 931. The Commonwealth Court's reversal of the grant of counsel fees was based on the fact that the fund involved in *Feltman* was not within the jurisdiction of the court, and that the implication of the *Jones* decision appeared to dictate that a court's ability to award attorney's fees was restricted by the laws enacted by the legislature and was not open to court propounded doctrines.

■ ¶ 11 We agree that the Commonwealth Court's reliance in *Feltman* on the Supreme Court's language in *Jones* is the proper avenue to follow and, therefore, we likewise do not recognize the common or substantial benefit doctrine as the law in Pennsylvania.[1] Moreover, we point out that Petow's reliance on *Couy* is misplaced in that the fund at issue from which the appellees were awarded counsel fees was a fund within the jurisdiction of the court, *i.e.*, the award fell within the auspices of the common fund doctrine. That fact alone distinguishes *Couy* from the case presently before us. Furthermore, we posit whether Petow's law suit, which ended with an agreed upon termination, had any impact on the creation of the "fund" to begin with, when other actively pursued lawsuits contemporaneously alleged breach of fiduciary duties by John and other directors of HFC's Board. Succinctly stated, Petow has not convinced us that he and the other plaintiffs that brought this suit have any legal basis upon which they would be entitled to an award of attorney's fees. Consequently, we affirm the trial court's order denying the requested counsel fees.

¶ 12 Order affirmed.

■

---

1. "This Court is not bound by decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." *Maryland Cas. Co. v. Odyssey*, 894 A.2d 750, 756 n. 2 (Pa.Super.2006) (citing *Citizens' Ambulance Service Inc. v. Gateway Health Plan*, 806 A.2d 443, 446 n. 3 (Pa.Super.2002)).